**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**UNITED STATES OF AMERICA,**

v.                                                    **Criminal Action No. 4:06cr6**

**JOHN J. SMALL,**
          **Defendant.**

## OPINION AND ORDER

On April 6, 2006, the court conducted a hearing to address defendant's motion to suppress evidence and motion to sever defendants. For the reasons stated on the record during the hearing on this matter, as well as the reasons set forth herein, the court **DENIES** both of defendant's motions.

### I.  Factual Background

On March 15, 2005, at approximately 2:15 a.m., police officers arrived at 3534 Kecoughtan Road, Hampton, Virginia, and knocked on the apartment door of Caleb Carr, the co-defendant is this case. The officers were dispatched to Carr's apartment because Carr had been shot while allegedly attempting an armed robbery shortly after 10:30 p.m. on March 14, 2005. The alleged robbery occurred at a Food Lion grocery store, also on Kecoughtan Road, and during the incident Carr sustained a potentially life threatening wound to the head when he was shot by the store security guard. After Carr was identified, police officers were sent to 3534 Kecoughtan Road because, based on Carr's DMV records, that location was his last known address. While the officers were responding to Carr's residence, another officer returned to the police station to begin preparing a search warrant for Carr's apartment.

A warrant for Carr's apartment was such an immediate concern because prior to the

incident on March 14, 2005, Hampton and Newport News police were on the lookout for two
African American males who were suspects in at least six armed robberies occurring over the
previous three months.  The prior robberies were all committed by two masked robbers, guns
were brandished and usually discharged, and store employees and customers were threatened
with injury or injured.  Notably, three of the six prior robberies occurred on Kecoughtan Road
and one of the prior robberies occurred at another Food Lion grocery store.  The robbers'
willingness to use violence, including discharging their weapons, was such a substantial concern
to the police that on some nights around the time of March 14, 2005, the Hampton and Newport
News police departments collectively had up to fifty officers attempting to apprehend the violent
robbers before more members of the public were injured.  Therefore, following Carr's
apprehension, officers secured the Food Lion grocery store, collected evidence, and searched the
store and surrounding area for a potential accomplice, knowing that in the past the violent
robbers had always worked as a pair.  The evidence collected from the store included Carr's gun
which matched the caliber and description of one of the guns used in the prior robberies, further
indicating to the police that they had apprehended one of the two robbers currently at large.

As the officers investigating the Food Lion robbery suspected that Carr was one of the
violent robbers that they had been searching for, officers were sent to Carr's reported address to
verify that the location was in fact Carr's residence and, if the address was confirmed, to secure
the location until a search warrant could be obtained.  Upon arriving at the apartment reported as
Carr's residence, the officers knocked on the door and defendant, John Small, partially opened
the door identifying himself as Carr's roommate.  After Small identified himself, the officers
asked if they could come inside the apartment and talk; Small then stepped outside of the

2

apartment and closed the door behind him.  Small spoke with the officers outside the apartment

for approximately 10-20 minutes, and voluntarily provided identifying information.  In response

to the officers' questions, Small indicated that he had been staying with Carr for the past few

months and also told the officers that there was currently another person in the apartment, a

female friend of Small.  At some point during the conversation, the officers suspected that Small

might be the second robber as he had been living with Carr during the same stretch of time that

the string of local robberies had occurred, and he matched the general description of the second

robber, a tall, slender, black male.

  While still outside of the apartment, the officers told Small that they were there to secure

the residence for an upcoming search, and that Small needed to have the woman come outside.

At this point, Small began acting nervously, and requested that he be allowed to reenter the

apartment alone.  The officers refused Small's request both due to the fear that Small may

destroy evidence and the fact that Small would pose a safety risk if the officers allowed him to

reenter the apartment unescorted.  The officers told Small that he would not be required to

remain at the apartment until the search was conducted, nor would his female friend; however,

she needed to come outside and Small would not be permitted to go get her without being

escorted.  Small opened the door to the apartment and the officers followed him in, right on his

heels.[1]

  Upon entering the apartment, the officers encountered Allison Street, the woman Small

---

[1] At the hearing on this matter, the defense presented testimony of Allison Street, the woman who was inside the apartment.  Ms. Street claimed that upon reentering the apartment, Small closed the door behind him and that the officers had to open the door in order to enter. Based on a credibility determination, the court did not give much weight to such testimony.

had spoken of, standing in the living room.  One of the officers conducted a protective sweep of the rest of the apartment, briefly checking the bedroom and bathroom to ensure that no one else was inside the apartment.  While the officers explained their reason for securing the premises "Small continued acting very nervous and looked as if he wanted to flee" (Govt. Resp. Mo. Suppress 3).  While standing and talking with Small and Street, the officers also saw a "Scream" mask in plain sight on top of the refrigerator.  Such style of mask was known to the officers as "commonly used by robbers to hide their identities" (Govt. Resp. Mo. Suppress 3).  The mask increased the officers' suspicion that Small was the other robber.

Small and Street were told by the officers that they were free to stay until the search was conducted or free to leave; however, if they stayed, they would be required to stay on the couch to ensure the officers' safety.  Small continued acting nervously, accused the officers of violating his rights, and indicated that he wanted to take his jacket and leave.  The officers told Small that he would not be able to remove anything from the premises.  During the conversation that occurred inside of the apartment, Small was repeatedly fidgeting with his left waistband area. Due to Small's increasingly nervous behavior and the fact that Small appeared to want to get out of the apartment as soon as possible, as well as the officers' original goal of securing the evidence in the apartment, the officers asked Small if he had any weapons on him.  Small said that he did not.  The officers then asked Small to lift up his shirt to show that he didn't have any weapons.  Small "continued to act extremely nervous, insisted that he did not have any weapons, and refused to lift up his shirt" (Govt. Resp. Mo. Suppress 3).  According to testimony at the hearing, Small patted at his baggy shirt attempting to indicate that he had no guns; however, Small wouldn't lift his shirt and revealed little by patting near his waist.  Likewise, Small's

nervousness increased until he had a "face like a rabbit" in a "fight or flight" mode. Based on

Small's response to questions about firearms, his nervous conduct, and the fact that he repeatedly

refused to simply lift his shirt to display that he was not armed, the officers decided to perform a

Terry frisk.

After Small placed his hands on the wall to allow the officers to pat him down, Small

started lowering his left hand towards his waist area. The frisk was momentarily stopped as the

officers drew their weapons and demanded that Small put his hand back on the wall. Small

complied and the frisk resumed. The Terry frisk resulted in the officers locating a chrome 380

automatic handgun with black handle. The gun was found in Small's lower left leg area,

apparently having fallen down his pant leg from his left waist. Like the gun recovered from Carr,

the caliber and description of Small's gun matched a gun used in the string of robberies under

investigation. After locating the gun, the officers handcuffed Small as they had not yet searched

the apartment to ensure that no other weapons were present. Even after handcuffing Small the

officers did not conduct a search of the rest of the apartment, and instead waited until the search

warrant arrived. The officers allowed Ms. Street to leave after she consented to a search of her

purse to ensure that she was not removing evidence from the scene.

## II. Discussion

The defendant has filed two motions with the court; first, defendant seeks to suppress the

gun found during the Terry frisk alleging: (1) that the officers violated his privacy rights by

entering his apartment; and (2) the officers frisked him without any apparent fear for their safety.

The government contends that the officers behaved reasonably, properly entered the apartment to

ensure their safety and prevent the destruction or removal of evidence and that the Terry frisk

occurred only after the officers feared for their safety.  Second, defendant seeks to have his trial

severed from the trial of co-defendant Caleb Carr.  The government opposes severance, arguing

that limiting instructions and other procedures will alleviate defendant's concerns.  The court will

addresses each motion in turn.

**A. Motion to Suppress**

**1. Entering the Apartment**

When balancing "privacy-related and law enforcement-related concerns," the Fourth

Amendment's "'central requirement' is one of reasonableness." Illinois v. McArthur, 531 U.S.

326, 330-31 (2001).  Although warrantless searches and entries are presumptively unreasonable,

it is well settled that exigent circumstances permit a warrantless search when probable cause to

search exists and officers reasonably believe that contraband or other evidence may be destroyed

or removed before a search warrant can be obtained.  Mincey v. Arizona, 437 U.S. 385 (1978).

Likewise, exigent circumstances permit warrantless entry and control of property while a search

warrant is being obtained.  McArthur, 531 U.S. at 331-32; United States v. Cephas, 254 F.3d

488, 494-95 (4th Cir. 2001).  Furthermore, exigent circumstances can justify entry based on

officer safety as the "doctrine of exigent circumstances basically encompasses officer safety and

the destruction of easily disposed evidence." Gould v. Davis, 165 F.3d 265, 271 (4th Cir. 1998).

To determine if exigent circumstances permitting a warrantless entry exist, the Fourth

Circuit has set forth a two-part test stating that entry is proper "where police officers (1) have

probable cause to believe that evidence of illegal activity is present; and (2) reasonably believe

that evidence may be destroyed or removed before they could obtain a warrant." Cephas, 254

F.3d 494-95.  Here, the first element of the Cephas test is clearly met based on the facts outlined

above.  The officers responding to the apartment on Kecoughtan Road on March 15, 2005, were there in part to ensure that they had been provided the correct address for Caleb Carr's residence. While those officers were responding to the apartment, another officer was in the process of preparing an application for a search warrant for Carr's residence.  The officers were seeking such warrant because Carr, who had just hours earlier been shot while in the commission of an armed robbery, was a suspect in at least six prior violent robberies.  Carr was linked to these robberies because he fit the description of one of the robbers, was apprehended in possession of a firearm that matched the caliber and description of a firearm used during the prior robberies, and Carr was captured while attempting to rob a Food Lion grocery store on Kecoughtan Road.  Not only had one of the prior robberies occurred at Food Lion store, but three of the six prior robberies had occurred on Kecoughtan Road.  Furthermore, when the officers arrived at the apartment, which was also on Kecoughtan Road, they encountered an individual who met the description of the second robber and who was clearly nervous at the proposition of police entering the apartment.  On these facts, the officers had probable cause to believe that the apartment, confirmed to be the residence of both Carr and Small, had evidence of illegal activity.

Moving to the second prong of the test outlined in Cephas, whether the officers "reasonably believed" that evidence might be destroyed or removed, the Cephas court relied on the five part test set forth in United States v. Turner, 650 F.2d 526 (4th Cir. 1981), which instructs a district court to consider:

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
(2) the officers' reasonable belief that the contraband is about to be removed or destroyed;
(3) the possibility of danger to police guarding the site;
(4) information indicating the possessors of the contraband are aware that the police are on their trail; and
(5) the ready destructibility of the contraband.

Cephas, 254 F.3d at 494-95.  Here, the court concludes that exigent circumstances justified the

officers' decision to enter the apartment.  First, the "degree of urgency" was high as the officers

reasonably suspected that the second robber, present at all six of the prior robberies, was present

at the unsuccessful Food Lion robbery or, at a minimum, was aware that Carr had been captured.

Likewise, urgency is evidenced by the large scale search already in place aimed at locating the

two violent suspects who robbed numerous businesses in a short time span.  The officers'

expedited investigation included obtaining a warrant as quickly as possible.  Second, by the time

the officers entered the apartment they reasonably believed that evidence may be destroyed or

removed because the officers had identified themselves prior to Small opening the door and they

subsequently learned that there was an individual inside the apartment during the entire extended

conversation occurring outside the apartment.  Furthermore, Small initially would not let the

officers inside, attempted to reenter alone, and became increasingly nervous when the officers

refused to allow him to reenter unescorted.  Third, the possibility of danger to the police was

evident as the apartment was located in a dangerous area and was the known residence of Caleb

Carr, a violent robber clearly tied to an armed robbery occurring just hours earlier.  Likewise,

Small, the individual talking with the officers, fit the description of the second violent robber,

was growing increasingly nervous, and wanted to reenter the apartment unescorted.   Fourth, the

police reasonably believed that the "second robber," present at all of the previous violent

robberies, knew that officers were on his trail as his partner was shot and captured by the police.

Furthermore, even if Small had been unaware that the police had captured Carr, once officers

arrived on his doorstep, asked questions about Carr and himself, and indicated that they would

soon be searching his apartment, Small, who was acting nervously and fit the general description

8

of the second robber, clearly was aware that the police were "on his trail."  Fifth, although the suspected contraband at issue was likely guns, ammunition, currency, and other physical evidence which may not be rapidly destroyed, the officers discovered that there was another individual in the apartment who likely knew that the police were outside.  Both <u>Cephas</u> and <u>Turner</u> recognize that the court should consider not only whether evidence may be destroyed but also whether it may be "removed."  Therefore, here, where the evidence was relatively small and easily removable, and Ms. Street was left inside the apartment during the extended conversation on the doorstep, as well as the fact that defendant repeatedly tried to reenter the apartment unescorted, the police were reasonable in believing that evidence may be removed if they waited outside until a search warrant was obtained.

Therefore, under the tests outlined in <u>Cephas</u> and <u>Turner</u>, here, the officers were justified in entering the apartment in order to secure the premises while a search warrant was obtained. It is important to recognize that when analyzing whether exigent circumstances permit a warrantless entry, it is not necessary to conclude that the destruction or removal of evidence was actually imminent; "rather, the proper inquiry focuses on what an objective officer could reasonably believe."  <u>United States v. Grissett</u>, 925 F.2d 776, 778 (4th Cir. 1991).  Here, based on the analysis above, the officers were reasonable in believing that if they allowed Small to reenter the apartment, the destruction or removal of evidence would occur.[2]

---

[2] Furthermore, even if entry was not justified based only on the potential for removal of evidence, on these facts, the officers were justified in entering the apartment to ensure their safety.  After arriving at the apartment, the officers confirmed that they were at the residence of Caleb Carr, who was apprehended just hours earlier while in the commission of an armed robbery.  Furthermore, the individual standing before them lived with Carr during the time period of the string of violent robberies, was acting nervous, was trying to reenter the apartment alone, and fit the general description of the second robber.  As the "central requirement" of the Fourth

The appropriateness of the officers' entry into Carr and Small's apartment is further illuminated by the similarity of the instant facts to those of <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001).  In <u>McArthur</u>, the police had reliable information that the defendant had drugs hidden in his trailer and while one officer and a witness were obtaining a search warrant, another officer secured the premises, telling the defendant that he "could not reenter the trailer unless a police officer accompanied him."  <u>Id.</u> at 329.  Although the officer allowed the defendant to reenter the trailer several times, the officer stepped inside the doorway and watched all of defendant's actions.  <u>Id.</u>  Notably, here, the officers requested exactly what the Supreme Court permitted in <u>McArthur</u>.  Here, after Small told the officers about Ms. Street's presence in the apartment the officers told Small she would have to come outside as they, like the officer in <u>McArthur</u>, wanted to ensure that evidence was not tampered with until the search warrant arrived.  When Small asked to reenter the apartment, the officers did not refuse him such right, they just told him that he could not reenter alone.  In <u>McArthur</u> the Supreme Court explained:

> [T]he police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy.  They neither searched the trailer nor arrested [the defendant] before obtaining a warrant. Rather, they imposed a significantly less restrictive restraint, preventing [the defendant] only from entering the trailer unaccompanied.  They left his home and his belongings intact--until a neutral Magistrate, finding probable cause, issued a warrant.

<u>Id.</u> at 332.  The court concluded:

> In sum, the police officers in this case had probable cause to believe that a home contained contraband, which was evidence of a crime.  They reasonably believed that the home's resident, if left free of any restraint, would destroy that evidence.

---

Amendment is one of reasonableness, and the officers were not entering the apartment to conduct a search but only to secure the premises and secure their safety until a warrant arrived, the officers behaved reasonably in reacting to the rapidly unfolding situation in the middle of the night in a dangerous neighborhood.

And they imposed a restraint that was both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests.  In our view, the restraint met the Fourth Amendment's demands.

Id. at 337.  In Cephas, the Fourth Circuit approved similar conduct, as after receiving a tip about drug use in a nearby apartment and smelling a strong marijuana odor when the apartment door was opened, officers were deemed to have been justified in forcibly pushing their way into the apartment and securing the premises.  Cephas, 254 F.3d at 488.  The officers "secured the location by patting down the occupants" and required that the eight or nine individuals remain in the living room until the warrant arrived.  Id. at 491.  The officers prohibited anyone from using the bathroom unless they consented to be searched.  Id.  The Fourth Circuit reversed the district court's suppression of the drugs and guns found inside the apartment, determining that exigencies justified the warrantless entry.  Id.

On these facts, like in McArthur and Cephas, the officers intended only a "temporary seizure" to preserve evidence.  If there were clearly no other individuals inside the apartment, the police could likely have achieved their goal by remaining outside with Small until the warrant arrived.  However, the police were alerted that Ms. Street was in the apartment so they acted in a manner consistent with the actions permitted in McArthur, they escorted Small into the apartment and in doing so, ensured their own safety and ensured that evidence was not destroyed or removed.[3]  Although the police made a protective sweep of the premises, they did not search the apartment prior to the arrival of the warrant.  The officers therefore acted reasonably and

---

[3]  The McArthur opinion also noted that temporarily keeping a person from entering his home is "considerably less intrusive" than a warrantless search and that the Court was unaware of any Supreme Court case that "has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."  McArthur, 531 U.S. at 334, 336.

appear to have had no choice but to react the way they did to the situation that presented itself

during the early morning hours of March 15, 2005. In escorting Small inside the apartment with

the goal of locating Ms. Street and not to conduct a warrantless search, the officers made

"reasonable efforts to reconcile their law enforcement needs with the demands of personal

privacy." McArthur, 531 U.S. at 332.

### 2. Terry Frisk

In order for the officers to have been justified in frisking Small, the unusual conduct they

witnessed while interacting with him must have reasonably led them to conclude, in light of their

experience, that: (1) "criminal activity may be afoot;" and (2) Small "may be armed and presently

dangerous." Terry v. Ohio, 392 U.S. 1, 30 (1968). Such suspicion is not required to rise to the

level of probable cause, however, it must be "supported by articulable facts." United States v.

Crittendon, 883 F.2d 326, 328 (4th Cir. 1989) (quoting United States v. Sokolow, 490 U.S. 1, 7

(1989)). Furthermore, "[t]he presence or absence of reasonable suspicion must be determined in

light of the totality of the circumstances . . . including all information available to an officer and

any reasonable inferences to be drawn at the time of the decision to stop a suspect." Id. at 328.

More specifically, "relevant to the totality of circumstances are various individual factors

traditionally relied upon by police officers, such as . . . whether the suspect engaged in evasive

behavior or acted nervously." United States v. Mayo, 361 F.3d 802, 805-06 (4th Cir. 2004); see

United States v. Haye, 825 F.2d 32, 34 (4th Cir. 1987) ("Against the background of drug courier

characteristics they had shown, [defendants'] flight from the presence of two men upon their

announcement that they were policemen gave the policemen reasonable, articulable suspicion,

based upon objective facts, quite sufficient to warrant a Terry stop."); United States v. Sharpe,

470 U.S. 675, 683 n.3 (1985) (finding that evasive actions coupled with other factors "as appraised by an experienced law enforcement officer" establish reasonable suspicion). Likewise, officers may also consider the time of day and the characteristics of the area a suspect is found in, such as whether it is known to be a high crime area. United States v. Lender, 985 F.2d 151 (4th Cir. 1993). In Lender, the Fourth Circuit explained: "While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." Id. at 154. Similarly, in Mayo the Fourth Circuit found that reasonable suspicion justified the Terry stop "based on the defendant's furtive and evasive conduct in a high-crime area, the way he was holding his left hand in his jacket pocket, his physical response to the confrontation with police officers, and his response to questions regarding where he lived and whether he was carrying any weapons." Mayo, 361 F.3d at 804-05 (emphasis added).

Here, the officers' knowledge of the circumstances, as well their ample interaction with Small, indicated: (1) throughout the encounter Small grew increasingly nervous, especially at the prospect of the officers entering or searching the apartment; (2) Small wanted to get away from the officers, first by attempting to reenter the apartment unescorted and then by indicating his desire to leave the apartment as soon as possible; (3) the area that the apartment was located in was dangerous;[4] (4) the apartment, the confirmed residence of Caleb Carr who had been shot just hours earlier while attempting a violent armed robbery, likely contained weapons; (5) Small repeatedly fidgeted with his left waist area and refused to lift his shirt to show that he did not

---

[4] Defendant's own witness at the hearing on this matter characterized the area as very dangerous. The court has no information to the contrary.

have any weapons; and (6) similar to the facts of <u>Mayo</u>, Small reacted nervously when the officers asked him if he had any weapons and Small's facial expression in response to such questions was characterized by one of the officers as a face like a rabbit in a "fight or flight" mode.  On top of all of these factors creating reasonable suspicion that the defendant may be armed and presently dangerous, the defendant fit the description of the second violent robber and was found living with the captured violent robber.  Although the description of the second suspect, "a tall, slender black male," was a rather vague description, the defendant was not profiled on the street or through a traffic stop; rather, he was found at the captured robber's apartment and stated that he had lived there for the past few months, the same time as the string of robberies.  Considering all these facts together, the officers had reasonable suspicion to perform a <u>Terry</u> frisk.

In contrast, defendant argues that the officers only frisked him in order to prevent evidence from leaving the scene, and some of the testimony from the hearing supports such position.  However, considering the facts as found by the court, although the officers may have asked the defendant questions about whether he was armed only to prevent evidence from leaving the scene, it was the defendant's reaction to such questions, coupled with all of the other factors, that caused the officers to search him.  Therefore, the search was reasonable as even though the conversation may have been nearing its end, at the time the officers asked about weapons they were in close proximity with the defendant and his behavior made the officers fear for their safety.  As stated by the Supreme Court in <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972), an officer may conduct a limited protective search "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is

armed and presently dangerous to the officer or to others." (citations omitted). Thus, even if preventing evidence from leaving the scene was a major concern of the officers, as soon as Small's nervous answers, fidgeting with his waistband, and "fight or flight" expression put the officers in fear for their safety, the search became justified. Based on the credibility of the witnesses and the totality of the evidence, the defendant's motion is denied.

### B. Motion to Sever Defendants

Federal Rule of Criminal Procedure 8(b) permits the joinder of two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. Pro. 8(b). However, Rule 14(a) permits the court to order a severance of joined defendants if "consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. Pro. 14(a). The Fourth Circuit adheres to the "well-established principle that defendants who are charged in the same criminal conspiracy should be tried together . . . for the sake of judicial economy." United States v. Reavis, 48 F.3d 763, 767 (4th Cir. 1995) (citations omitted); see United States v. Parodi, 703 F.2d 768, 779 (4th Cir. 1981) (finding that persons properly joined in an indictment should be tried together, "and this is particularly so if a conspiracy is charged").

Once defendants are joined, severance should only be granted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). To prove that joinder would comprise rights, a defendant "must establish that actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." Reavis, 48 F.3d at 767 (emphasis added). Therefore,

15

conflicting or antagonistic defenses, the "presence of hostility among defendants," or "the desire

of one to exculpate himself by inculpating another are insufficient grounds to require separate

trials." United States v. Spitler, 800 F.2d 1267, 1271 (4th Cir. 1986) (citations omitted).  Rather,

in order for severance to be warranted, there must be such a "stark contrast" in defenses that "the

jury is presented with the proposition that to believe the core of one defense it must disbelieve

the core of the other" or that the conflict in defenses "alone demonstrates that both are guilty."

United States v. Najjar, 300 F.3d 466, 474 (4th Cir. 2002).  Severance is also required if a non-

testifying co-defendant's confession naming the defendant as a participant in the crime is

admitted.  Bruton v. United States, 391 U.S. 123 (1968).  Although redacting a co-defendant's

confession is a potential solution, even a redacted confession will not cure Bruton problems if it

remains "clear that a particular defendant is implicated."  United States v. Akinkoye, 185 F.3d

192, 197 (4th Cir. 1999).  Here, Small moves for his trial to be severed from co-defendant Carr's

trial, arguing first, that the extensive evidence against Carr may improperly result in a guilty

verdict by association for Small; and second, that co-defendant Carr's confession may implicate

Small creating confrontation problems under Bruton.

### 1.  Inference of guilt based on the evidence against co-defendant Carr

As noted above, a defendant is not entitled to severance merely because a separate trial

might "offer a better chance of acquittal."  Reavis, 48 F.3d at 767.  Likewise, there is no general

right to severance based on the assertion that evidence against a co-defendant is stronger than

evidence against the defendant seeking severance.  United States v. Strickland, 245 F.3d 368, 384

(4th Cir. 2001).  Severance is only necessary with respect to unequal evidence if the charges are

such that a jury could not "reasonably be expected to compartmentalize the evidence as it relates

to separate defendants in view of its volume and limited admissibility." United States v. DeLarosa, 450 F.2d 1057, 1065 (3d Cir. 1971). Furthermore, potential prejudice from differing evidence can be mitigated, if not completely avoided, by limiting instructions.

The Fourth Circuit addressed the "spill-over" argument that Small relies on in United States v. Smith, 44 F.3d 1259 (4th Cir. 1995). In Smith, the defendant claimed that evidence presented by his two co-defendants at trial involving allegations of fraud "spilled over" to unfairly implicate him as he was only involved in a minor portion of the alleged fraudulent scheme. Smith, 44 F.3d at 1266. The court, noting the government's broad discretion to join defendants who qualify under Rule 8, explained:

> In deciding whether to grant a Rule 14 motion, the district court is given broad discretion in weighing the inconvenience and expense to the government and witnesses in conducting separate trials against the prejudice to the defendants caused by a joint trial. Because joint participants in a scheme often will point the finger at each other to deflect guilt from themselves or will attempt to lessen the importance of their role, a certain amount of conflict among defendants is inherent in most multi-defendant trials. In order to justify a severance, however, joined defendants must show that the conflict is of such magnitude that "the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."

Id. at 1266-67 (quoting United States v. Becker, 585 F.2d 703, 707 (4th Cir. 1978)). Likewise, in United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir. 1992), two defendants argued that the evidence against them was "significantly weaker than the evidence against the other defendants" and that their convictions may have been based on "the strength of 'spillover' evidence." The Fourth Circuit concluded that the record failed to indicate that either defendant was convicted based on "spillover" evidence because "the district court properly instructed the jury that it was not to consider the evidence against one defendant when deciding upon the guilt or innocence of another defendant, and there is no suggestion in the record that the jury failed to follow this

17

instruction." <u>Id.</u>  Likewise, the court noted that there was "abundant evidence–independent of the evidence against their co-defendants–supporting the convictions" of both defendants that made the spillover argument.  <u>Id.</u>

     Here, Small argues that the evidence against co-defendant Carr is stronger than the evidence against him, and that Carr's capture during the March 14, 2005 Food Lion robbery will unfairly implicate Small.  However, in contrast to Small's contentions, there is ample evidence against Small, who allegedly participated in six of the seven robberies charged in the indictment and who was found in possession of a gun that was tied to the robberies through <u>ballistic</u> evidence.[5]  Furthermore, Small admitted that he owned the gun tied to the robberies and that, other than when he went to work, he always carried it for protection.  Small also lived with Carr during the same time period that the string of six robberies occurred and a second mask and pair of gloves consistent with those used in the robberies was found at Carr and Small's apartment.  Thus, like in <u>Brooks</u>, here the government possesses "abundant evidence" against Small independent from Carr's March 14, 2005 Food Lion robbery.

Additionally, Small fails to establish that the jury will be unable to make a reliable judgment about guilt or innocence based on the nature of the evidence.  Rather, the nature of the pertinent facts indicate that, at trial, the government can easily separate each defendant's alleged involvement in each of the seven robberies.  As Small was allegedly involved in six different robberies that were committed by two men working as a team, the government's evidence will necessarily be "compartmentalized" as the government will call different witnesses for each

---

[5]  The robbers discharged their guns during five of the six robberies that Small allegedly participated in.

robbery and discuss the facts of that robbery and the evidence as it relates to each of the two masked individuals who robbed each store.  Furthermore, the government has indicated its intention to request limiting instructions, which are preferred over the more radical remedy of severance.  Therefore, as nothing suggests either that the government does not possess sufficient evidence to convict Small or that, with proper limiting instructions, the jury would be unable to consider the evidence separately against each defendant, severance is not warranted.

### 2.  Co-defendant Carr's confession and the Bruton Rule

The danger of one defendant's confession violating the Sixth Amendment in multi-defendant case has been thoroughly discussed by the Supreme Court and the Fourth Circuit; on these facts, it appears that any potential prejudice can be avoided through redaction and the use of limiting instructions.[6]  Bruton, 391 U.S. at 135-36; Najjar, 300 F.3d at 474.  Bruton requires severance if a non-testifying co-defendant's unredacted, or ineffectively redacted, out of court confession implicates a defendant.  Bruton, 391 U.S. at 135-36; Akinkoye, 185 F.3d at 197.  However, the Supreme Court has held that when a redacted confession does not even refer to another party severance is not required.  Richardson v. Marsh, 481 U.S. 200, 211(1987).  Likewise, the Fourth Circuit has held that when redacted statements refer to a third party but use "neutral pronouns" such as "another person," or "another individual," severance is not necessary so long as "the jury neither saw nor heard anything in the confessions that directly pointed to the other defendant."  Akinkoye, 185 F.3d at 198.

---

[6] The concern related to Bruton only involves co-defendant Carr's confession.  Statements made by Carr during the course of the conspiracy do not create a Bruton problem and are admissible against Small as statements "by a coconspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E); see United States v. Brooks, 957 F.2d 1138, 1146 (4th Cir. 1992).

Here, the government has affirmatively stated its intent to "sanitize" Carr's confession in order to avoid any problems under <u>Bruton</u>, and it appears that such redaction would be effective on these facts.  The government clearly intends to establish that there were two robbers at each of the first six robberies, and store employees and customers can testify to such.  Once this has been established, a confession by Carr stating that "another individual" committed six of the robberies with him will not unfairly implicate Small, but rather, will confirm that there were in fact two robbers.  Small will be able to argue that he was not the second robber and there will be no inherent conflict before the court.  Thus, the jury would be capable of finding that overwhelming evidence established that there were two robbers who committed the first six robberies, yet at the same time conclude that Small was not one of the robbers.

Therefore, the court finds that careful redaction of Carr's confession, in conjunction with limiting instructions, will adequately protect Small's rights under the Sixth Amendment as discussed in <u>Bruton</u>.  Nothing before the court suggests that the present situation requires the radical measure of severance rather than careful redaction and limiting instructions to the jury. Therefore, defendant's motion is denied.

### III.  Conclusion

For the reasons stated on the record during the hearing on this matter and discussed more fully above, defendant's motion to suppress evidence and motion to sever defendants are **DENIED**.  The officers properly entered Carr and Small's apartment to secure evidence and provide for their safety based on exigent circumstances.  Furthermore, a <u>Terry</u> frisk was warranted based on the officers' experience, the circumstances surrounding the frisk, and the defendant's nervous behavior.  Additionally, severance of the defendants is not warranted

because the evidence before the court is easily compartmentalized into discreet criminal acts, and a carefully redacted confession and limiting instructions will protect Small's rights and ensure that confrontation problems do not arise.

The Clerk is **REQUESTED** to send a copy of this Order to counsel for the defendant, counsel for co-defendant Caleb Carr, and to the United States Attorney, Eastern District of Virginia, World Trade Center, Suite 1800, 101 West Main Street, Norfolk, Virginia 23510.

**IT IS SO ORDERED.**

<div align="right">

_____/s/_____

Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

</div>

Norfolk, Virginia
April  11  , 2006